KLP ENTERPRISES, LLC,

     Plaintiff,

     v.

THOMAS J. SASSANI,

     Defendant.

No. 3:17-cv-665 (MPS)

## RULING ON MOTION TO STRIKE JURY DEMAND

Plaintiff KLP Enterprises, LLC ("KLP") has moved under Fed. R. Civ. P. 39 to strike Defendant/Counterclaim Plaintiff Thomas J. Sassani's demand for a jury trial (ECF No. 30). (*See* ECF No. 66.) KLP argues that the relevant agreements between the parties contained enforceable waivers of Sassani's jury trial rights, and that those waivers apply to all remaining claims in the case. (*See* ECF No. 66-1 at 4–5.) Sassani filed an opposition to the motion, and KLP filed a reply. (ECF Nos. 69, 76.) For the reasons set forth below, KLP's motion to strike Sassani's jury demand is GRANTED in part and DENIED in part. (ECF No. 66.)

## I.     Background

I assume the reader's familiarity with the record and set forth only those facts necessary to decide KLP's motion.[1]

### A.     The Parties

KLP is an investor in Zozi, a start-up online reservation, payment and customer management software and system used to book travel tours and activities. (ECF No. 54 at 1.) Sassani was a shareholder in Zozi and, until his termination on January 24, 2017, its CEO. (*Id.*)

---

[1] For additional background, I refer the reader to the summary set forth in my decision denying KLP's motion for summary judgment. (ECF No. 54.)

### B. Jury Trial Waivers

On or about April 11, 2016, KLP and Sassani entered into three related agreements in connection with KLP's $5.7 million loan to Sassani: a Note, Pledge Agreement, and Security Agreement. All three agreements contain virtually identical jury trial waiver provisions.

The jury trial waiver in the Note provides:

> 18.1 BORROWER BY EXECUTION HEREOF, AND THE SECURED PARTY BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS NOTE OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE HOLDER TO MAKE THE LOAN AND ACCEPT THIS NOTE.

(*See* ECF No. 66-7, Exhibit 5-A to the Declaration of Gerry Silver, Esq. ("Silver Decl."), at § 18.1 (hereinafter the "Note").) Similarly, the jury trial waiver in the Pledge Agreement provides:

> 16. <u>Jury Trial Waiver</u>. BORROWER BY EXECUTION HEREOF, AND LENDER BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTE, OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO AND ACCEPT THIS AGREEMENT.

(*See* ECF No. 66-7, Silver Decl. Ex. 5-B, at § 16 (hereinafter the "Pledge Agreement").) Finally, the jury trial waiver in the Security Agreement provides:

> Section 21. <u>Waiver of Jury Trial to the Extent Permitted</u>. THE BORROWER BY EXECUTION HEREOF, AND THE SECURED PARTY BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT BORROWER MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTE, OR ANY AGREEMENT CONTEMPLATED TO BE

EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE SECURED PARTY TO ENTER INTO AND ACCEPT THIS AGREEMENT.

(*See* ECF No. 66-7, Silver Decl. Ex. 5-C, at  § 21 (hereinafter "Sec. Agreement").)   Sassani is defined as the "borrower" in all three agreements.  (*See* Note at 1; Pledge Agreement at 1; Sec. Agreement at 1.)

## C.    KLP's Evidence

KLP includes as exhibits numerous emails between Sassani, KLP, and attorneys from Gunderson Dettmer Stough ("Gunderson"), a law firm that served as Zozi's outside counsel (ECF No. 76 at 9), reflecting negotiations over the three agreements and Sassani's solicitation of advice from Gunderson about the loan arrangement.

On March 31, 2016, Sassani emailed KLP's Chief Executive Officer, Elon Boms, requesting a $5.7M loan from KLP secured against his assets, $5M of which would be a direct investment into Zozi.  (*See* ECF No. 76-3, Exhibit 2 to the Reply Declaration of Gerry Silver, Esq. ("Silver Reply Decl."), at 3.)  Sassani explained that he was "very confident in Zozi's future and appreciate the opportunity to participate further in it's [sic] success," and explained that the $5M investment would make KLP and Sassani "true partners and [Sassani] would be even more aligned with the success of the company."  (*Id.* at 3.)  Sassani also proposed, as part of Zozi's financing proposal, a third $5M tranche of loans beyond his initial immediate $5M investment, commenting that he was "keenly interested in increasing my ownership in ZOZI as much as possible."  (*Id.*) The same day, Sassani forwarded this email to George Brencher, KLP's attorney.  (*Id.* at 2.)

On April 4, 2016, Brencher sent Sassani "draft documents relating to the proposed loan from KLP to [Sassani]." (ECF 66-3, Silver Decl. Ex. 1, at 2.) The attachments, which are omitted from the exhibit, appear to be drafts of the Note, Pledge Agreement, and Security Agreement. (*Id.*)

In an April 7, 2016 email, Sassani indicated to Brencher that "[m]y counsel just got back to me with comments/questions." (*See* ECF No. 76-5, Silver Reply Decl. Ex. 4, at 1.) Later the same day, Sassani e-mailed Brencher again, attaching "docs with comments from counsel and a few additions/questions from me responding to their questions for me in the docs." (ECF No. 76-2, Silver Reply Decl. Ex. 1, at 2.)[2] Sassani's email copies, among others, Joshua C. Cook, a Gunderson attorney. (*Id.*) The email attaches drafts of the Note, Security Agreement, and Pledge Agreement. (*Id.* at 4–42.) Each draft contains the caption "GDS Comments 4/5/16" and numerous comments and edits in tracked changes, as well as various "[n]ote[s] to TJ [Sassani]" or "[n]ote[s] to Josh [Cook]" in footnotes. (*See, e.g., id.* at 11, 26.) There are no substantive comments or edits to the jury waiver provisions in any of the three agreements. (*See id.* at 11, 21, 38.)

On April 8, 2016, Brencher sent Sassani revised versions of the three agreements. (ECF 66-5, Silver Decl. Ex. 3, at 2.) His cover email states, in part, as follows: "Attached are clean and marked versions of the Note, Security Agreement and Pledge Agreement . . . . The marked versions show differences between your comments and the attached drafts. Elon and I went over the comments this morning and, as you will see, we accepted most of them, but not all." (*Id.*) Sassani responded to Brencher stating in relevant part that he "will reach out to Elon [Boms, KLP's CEO] to discuss any questions, and our counsel is reviewing now." (*Id.* at 1.) Sassani copied Boms,

---

[2] Although this email is also contained in ECF 66-4, Silver Decl. Ex. 2, KLP provided a more fulsome copy in its reply because the original was "apparently printed in a limited track changes mode showing only some of Sassani's's comments, so KLP submit[ted] . . . that same exhibit . . . in full track changes mode." (ECF No. 76 at 5–6.) I cite only the reply exhibit.

Cook, and others on the email. (*Id.*) In the same response, Sassani also challenged a change to the Security Agreement that expanded his pledged collateral to include all of his personal property and assets, present or in the future. (*Id.*)

Early on April 11, 2016, Sassani sent an email to Brencher, Cook, Boms, and others, asking Cook and another individual to "review all changes [to the documents from Brencher], approve, and let us know." (ECF No. 76-7, Silver Reply Decl. Ex. 6, at 2.) Sassani also asked for the lawyers' input on the appropriate method to distribute the loan to avoid triggering an IRS audit. (*Id.* at 3 ("[W]ould this loan be just as defensible and valid if it were wired from Elon directly on my behalf so as to not cause any undue concern from the IRS regarding money moving through my account?"; "[I]s it ok to have ZOZI pass those funds along to me, or best to have Elon initiate two wires . . .?"). Later that day, Sassani forwarded to Cook and others an email from Brencher proposing that Sassani and KLP sign a side letter to purchase Zozi stock. (ECF No. 76-6, Silver Reply Decl. Ex. 5.) In the email, which was also copied to Brencher, Sassani asked, "Gunderson, can you please confirm this makes sense?" (*Id.* at 2.)

KLP also includes Sassani's LinkedIn page as an exhibit. (ECF No. 66-6, Silver Decl. Ex. 4, at 2–4.) The page states in relevant part:

> Entrepreneur since the age of 12. Technology entrepreneur, investor, advisor, & avid adventurer. CEO, Chairman & founder of ZOZI.

> Part of several technology companies prior to ZOZI. Most recently as a member of early founding team at Lux Research, an emerging tech advisory firm.

(*Id.* at 2.)

Finally, KLP attaches as an exhibit a loan and security agreement dated February 20, 2015 between Ekoventure, Inc. and Bridge Bank, National Association, which Sassani signed as

Ekoventure's CEO and which also contains a jury waiver provision.  (ECF No. 76-4, Silver Reply Decl. Ex. 3; *id.* at 21, 24.)

### D.    Sassani's Declaration

Sassani submitted a declaration in support of his opposition, which is summarized below.  (ECF No. 70, Declaration of Thomas J. Sassani ("Sassani Decl.").)

Beginning in early 2016, Sassani had numerous conversations with Michael Vlock[3] and Boms about raising additional funds to facilitate Zozi's growth strategy.  (*Id.* at ¶ 2.)  According to Sassani, because Vlock and Boms were purposely slow to address the issue, Zozi's need for additional funds was acute by April 2016.  (*Id.*)  At that point, KLP – Zozi's single largest investor – was the only realistic source for additional investment.  (*Id.*)

Sometime prior to the end of March 2016, Boms and Vlock told Sassani that KLP might invest further in Zozi, but only if Sassani invested alongside it.  (*Id.* at ¶ 3.)  According to Sassani, although he believed in Zozi and was eager to invest further in it, he had little cash available to do so, in large part because Zozi frequently did not pay his salary or reimburse his expenses.  (*Id.*)  KLP agreed to lend Sassani funds to invest in Zozi and also agreed to invest another $5 million in Zozi alongside the loan.  (*Id.*)  After the loan was funded, that money was not deposited in Sassani's account but was wired directly to Zozi.  (*Id.*)

Sassani explains that the "counsel" referenced in his April 7, 2016 email to Brencher (ECF No. 76-2)[4] is Joshua Cook, who served as corporate counsel to Zozi.  (*Id.* at ¶ 4.)  Sassani never believed that Cook represented him personally, never signed an engagement letter, and was not billed for any legal services.  (*Id.*)  Cook reviewed a draft of the Note and suggested a few changes,

---

[3] Vlock is described in Sassani's brief as a principal investor in KLP.  (ECF No. 69 at 6.)
[4] Sassani's affidavit cites ECF No. 66-4, but as discussed above, the cover email in ECF No. 76-2 is identical.

which Sassani communicated to Boms. (*Id.*) Sassani had not had previous experience with promissory notes and related security documents or with litigation generally. (*Id.* at ¶ 9.)

At some point during the negotiations, Boms put an end to the discussions and issued an ultimatum: either Sassani sign the note as is or KLP not only would refuse to go through with the promised loan to Sassani for his Zozi investment, but would withdraw its offer to invest an additional $5 million in Zozi directly. (*Id.* at ¶ 5.) This would have resulted in the immediate loss of employment for all of Zozi's staff, and Zozi would have run out of cash and be rendered insolvent. (*Id.* at ¶¶ 5–6.) Boms also insisted that Sassani include his common stock in Zozi as additional collateral for the loan. (*Id.* at ¶ 5.) According to Sassani, this was, in retrospect, because of the voting rights attached to those stocks that allowed Sassani to prevent any sale of Zozi. (*Id.*) By waiting until the last minute, Boms and Vlock were able to obtain harsh terms that Sassani would have not otherwise agreed to, and Sassani viewed himself as having "no choice but to sign the note in the form that Boms insisted [he] sign." (*Id.* at ¶ 6.)

The terms of the loan spelled out in the Note, Pledge Agreement, and Security Agreement required Sassani to offer as collateral his preferred stock to be purchased with the loan, any management bonus he would receive in the event of any exit scenario, preferred shares in a separate company he owned called Lux Research, and his shares of Zozi common stock. (*Id.* at ¶ 7.) The total value of the collateral Sassani offered was $11.4 million. (*Id.*)

In early 2017, Sassani learned that Boms had been arranging a merger of Zozi with one of its main competitors, Peek Travel, Inc. ("Peek"). (*Id.* at ¶ 8.) Sassani emailed members of Zozi's Board of Directors to voice his concerns that the merger would violate the board's fiduciary duties towards shareholders. (*Id.*) In response, Boms attempted to terminate Sassani's employment during a call with members of the board. (*Id.*)

On March 7, 2017, KLP sent Sassani a Notice of Events of Default and told him that it would take possession of the collateral he had pledged to secure the loan. (*Id.*)

### E. Procedural Posture

With his initial answer, Sassani filed a jury demand under Fed. R. Civ. P. 38. (ECF No. 30.)[5] Following the Court's decision on KLP's motion for summary judgment, the following claims remain in the case. KLP has one claim against Sassani for breach of the Note. (*See* ECF No. 54 at 9.) In particular, KLP alleges that Sassani breached the Note in numerous ways, including "one or more Material Adverse Effects, breaches of representations or warranties, and/or breaches of covenants. . ." in the Note. (ECF No. 1 at 15.) Sassani has four remaining counterclaims against KLP, specifically: (1) Breach of the Implied Covenant of Good Faith and Fair Dealing; (2) Tortious Interference with Contractual Relations; (3) Breach of the Amended Voting Agreement; and (4) Violation of the Uniform Commercial Code. (ECF No. 54 at 10.)[6] I describe Sassani's allegations with respect to each of these counterclaims below.

## II. Legal Standard

"When asserted in federal court, the right to a jury trial is governed by federal law." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007). Under Federal Rule of Civil Procedure 39(a), where a proper jury demand has been made, "trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). "Although the right to a jury trial is fundamental and a presumption exists against its waiver, a contractual waiver

---

[5] KLP disputes neither the timeliness and sufficiency of Sassani's demand nor whether a jury right attaches to the counterclaims, but trains its fire exclusively on the waiver issue.

[6] I granted summary judgment to KLP on Sassani's counterclaim for breach of fiduciary duty; Sassani later withdrew his counterclaim for declaratory judgment. (ECF No. 54 at 10–11; ECF No. 57 at 1.)

is enforceable if it is made knowingly, intentionally, and voluntarily." *Merrill Lynch & Co. Inc.*, 500 F.3d at 188; *see also Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977) ("It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally."). "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver." *Sullivan v. Ajax Navigation Corp.*, 881 F.Supp. 906, 910 (S.D.N.Y. 1995); *Hendrix*, 565 F.2d at 258 (concluding that party asserting waiver had not shown it was enforceable). "If a contractual jury waiver is enforceable, a court must then analyze whether the claims in the action fall within the scope of the jury waiver clause." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 686 (S.D.N.Y. 2018).

## III.  Discussion

KLP argues that the jury trial waiver provisions in the Note, Pledge Agreement, and Security Agreement are enforceable, and that all remaining claims in this action fall within their scope. (*See* ECF No. 66-1 at 4–5.) While I agree that the waiver provisions are enforceable, I conclude below that one of Sassani's counterclaims falls outside the scope of the waivers.

### A.  The Jury Trial Waivers Are Enforceable

KLP first argues that the jury trial waivers provisions in the Note, Pledge Agreement, and Security Agreement are enforceable because Sassani entered into them knowingly, intentionally and voluntarily. (*See* ECF No. 66-1 at 8–11.) Sassani disagrees, arguing that the circumstances surrounding the execution of the Note and the disparity in bargaining power between the parties demonstrate that Sassani did not waive his right to a jury intentionally and voluntarily. (*See* ECF No. 69 at 9–12.) To determine whether a contractual waiver was entered knowingly, intentionally, and voluntarily, "courts must consider the following factors: negotiability of the contract terms,

disparity in bargaining power between the parties, the business acumen of the party opposing the waiver, and the conspicuousness of the jury waiver provision." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 (PKL), 2003 WL 21878815, at *3 (S.D.N.Y. Aug. 8, 2003) (internal quotation marks and citation omitted). "When the criteria outlined above have been met, the waiver has been deemed enforceable." *Morgan Guar. Tr. Co. of New York v. Crane*, 36 F. Supp. 2d 602, 604 (S.D.N.Y. 1999) (citation omitted). "Courts in the Second Circuit often address these inquiries . . . upon submission of affidavits or declarations accompanying a motion to strike." *Shakerdge v. Tradition Fin. Servs., Inc.*, No. 3:16-CV-01940 (VAB), 2017 WL 4273292, at *7 (D. Conn. Sept. 26, 2017) (collecting cases). I address each factor in turn.

First, the jury waiver provisions were negotiable. "The fact that a contract term was negotiable at the time the contract was being contemplated, even if the term itself was never specifically negotiated, suggests that subsequent consent to such term was knowing and voluntary." *Wechsler*, No. 94 CIV. 8294 (PKL), 2003 WL 21878815, at *3. "Proof of the negotiability of a contract term may include the fact that other provisions of the contract were successfully negotiated and changed." *Id.* "On the other hand, non-negotiability of a contract term may be demonstrated when the party consenting to the term was in a position where the party had no choice but to accept the provision." *Id.* (citing *Hendrix*, 565 F.2d at 258 (refusing to uphold a jury waiver in a situation where the defendant was dissuaded from consulting an attorney and "did not have any choice but to accept the . . . contract as written if [the defendant] was to get badly needed funds") and *Sullivan*, 881 F. Supp. at 911 (finding a waiver provision non-negotiable because "plaintiff had no choice other than to accept the contract as written")).

KLP argues that the agreements were negotiable because its April 2016 emails show that KLP's attorney, Brencher, invited comment from Sassani on the Note and Security Agreement,

Sassani provided comments on both agreements, and Brencher reviewed and accepted "most" of the comments. (ECF No. 66-1 at 9 (citing ECF No. 66-3, 66-4, 66-5, Silver Decl. Exs. 1, 2, 3); ECF No. 76 at 5–6.) Relying on his declaration, Sassani counters that he had "no choice" but to accept the contract as written. (ECF No. 69 at 9–10.) In particular, Sassani claims that Elon Boms stopped the loan discussions and gave Sassani an ultimatum at the last minute. (*See* ECF No. 70, Sassani Decl. ¶ 5.) According to Sassani, unless he agreed to the harsh terms that Boms dictated, KLP would have walked away not only from the loan to him but also from its commitment to invest $5M in Zozi. (ECF No. 70, Sassani Decl. ¶¶ 5–6.) Without these investments, Zozi would have become insolvent and soon forced to cease operations. (*See id.* at ¶ 6.)

KLP has shown that the jury trial waiver provisions were negotiable. The emails between Sassani and KLP from April 2016 show Sassani was able to negotiate particular terms and that Brencher accepted many of his proposed changes. (*See, e.g.,* ECF No. 66-5, Silver Decl. Ex. 3 (Brencher writes on April 8, 2016 that "Elon [Boms] and I went over the comments this morning and, as you will see, we accepted most of them, but not all.").) This contemporaneous evidence undermines Sassani's conclusory assertion that he had "no choice but to sign the note in the form that Boms insisted." (ECF No. 70, Sassani Decl. at ¶ 6.) Sassani's claim that Boms issued an "ultimatum" (at some unspecified time) that Sassani had to sign in the form Boms dictated is also belied by his emails to Gunderson the day of the signing, April 11, 2016, which noted that Boms and Sassani "agreed to make the below changes to the docs" and asked Gunderson to "review . . [and] approve" those changes. (*Id.* at ¶ 5; ECF No. 76-7, Silver Reply Decl. Ex. 6, at 2.) More importantly, the fact that Sassani proposed extensive changes to some terms in the agreements (many of which were accepted), but none to the jury trial waiver provisions, "suggests that subsequent consent to such term[s] was knowing and voluntary." *Wechsler*, 2003 WL 21878815,

at *3.  (*See generally* ECF No. 76-2, Silver Reply Decl. Ex. 1; *id.* at 11 (no proposed changes to jury waiver in Note), 21 (same in Pledge Agreement), 38 (same in Security Agreement).)

The second factor, the disparity in bargaining power between the parties, is a closer call. "[G]ross inequality in bargaining power suggests . . . that the asserted waiver was neither knowing nor intentional."  *Hendrix*, 565 F.2d at 258.  On the other hand, "little or no disparity in bargaining power reflects voluntary action and intent."  *Wechsler*, 2003 WL 21878815, at *4.  KLP argues that Sassani's proposed edits, most of which were accepted, and his familiarity with the process and with KLP demonstrate equivalent bargaining power.  (ECF No. 66-1 at 10.)  Sassani disagrees, citing the unequal dynamic between KLP and Sassani described above – most notably, KLP's power to bankrupt both Zozi and Sassani by refusing to extend the loan and its repeated threats to do so.  (ECF No. 69 at 10–11 (citing *Hendrix*, 565 F.2d at 258).)  KLP responds that Sassani's characterization that he was "desperate" for the loan is undercut by his own email proposing the loan arrangement and indicating that he wanted to own more of Zozi so he could share in its upside. (ECF No. 76 at 7.)  KLP further argues that, even accepting Sassani's characterization of why he needed the loan, needing a loan does not constitute by itself a "[g]ross inequality in bargaining power," or else jury trial waivers in the promissory note context would not be so regularly enforced.  (ECF No. 76 at 7–8.)

On balance, KLP has the better argument.  True, KLP and Sassani did not stand on equal footing; Sassani was an individual and, construing doubts in Sassani's favor, KLP's agreement to the terms of his personal loan was essential to Zozi's continued viability.  *Compare Wechsler*, 2003 WL 21878815, at *4 (finding no imbalance where parties were "all experienced corporate entities, of relatively equal bargaining power") *with Lehman Bros. Holdings Inc. v. Bethany Holdings Grp., LLC*, 801 F. Supp. 2d 224, 232 (S.D.N.Y. 2011) ("[T]he mere fact that Lehman

was a major financial institution [does not] necessitate the conclusion that the . . . defendants lacked adequate bargaining power."). Sassani does not, however, share the "gross inequality" in bargaining power with KLP that the Second Circuit found in *Hendrix*, where the owner of a small construction company was dissuaded from consulting an attorney and ended up entering into usurious "equipment leases" to maintain possession of necessary business equipment. *See Hendrix*, 565 F.2d at 256. Unlike that case, KLP has shown that Sassani was not *personally* on the brink of financial ruin. *Cf. id.* (proprietor unable to make monthly loan payments). Sassani's 2019 assertion that he had "little cash to [make the $5M investment] because Zozi frequently did not pay my salary or reimburse my expenses" is undercut by his March 31, 2016 email to Boms stating that he drew "a $150K salary from the company to this day" (ECF No. 76-3, Silver Reply Decl. Ex. 2 at 4) and is not particularly demonstrative of his financial instability where he was also able to offer substantial external collateral worth $11.4 million, including "[a] management bonus [he] would receive in the event of any exit scenario." (ECF No. 70, Sassani Decl. at ¶¶ 3, 7.) Sassani's supposed desperation is further belied by his initial proposal of the loan arrangement to Boms in order to make KLP and Sassani "true partners," and his explanation that he wanted to participate because he was "very confident in Zozi's future and appreciate[d] the opportunity to participate further in it's [sic] success." (*See* ECF No. 76-3, Silver Reply Decl. Ex. 2, at 3.) Finally, Sassani's ability to successfully propose revisions to the agreements, as discussed above, suggests that any imbalance in negotiating power was slight. *See Morgan Guar. Tr. Co. of New York*, 36 F. Supp. 2d at 604 ("[A]lthough there was clearly a difference in bargaining power between the sides—as there would be between a major bank and virtually any two individuals . . . the fact that the Cranes had previously negotiated changes to agreements made with Morgan further demonstrates their ability to negotiate with the bank."). While some inequality in

bargaining power existed between KLP and Sassani, it was not so extreme as to require invalidation of the jury waiver provisions.

Third, KLP has shown that Sassani had sufficient business acumen. Sassani had been CEO of Zozi since 2007, was a member of the early founding team at Lux Research, and had a BSBA double degree in International Business Management and Business Marketing. (*See* ECF No. 66-6, Silver Decl. Ex. 4.) As Sassani himself admits, "[he] is a successful businessman" and "was, in fact, experienced at the time [he] signed the note." (ECF No. 69 at 11, ECF No. 70, Sassani Decl. at ¶ 9.) Although Sassani argues that his success as a businessman says "nothing" about whether "the skills and responsibilities necessary for his success translate into an ability to negotiate and appreciate complex financial instruments," (ECF No. 69 at 11) the cases he cites do not support such a cabined view of what counts as "sophisticated" – Sassani's interpretation would suggest that only experienced contract lawyers or the like should be held to their agreements. *See, e.g.*, *Morgan Guar. Tr. Co. of New York*, 36 F. Supp. 2d at 604 (determining that the individuals against whom the waivers were to be enforced were "experienced business people" because one was "inventor and founder, President, Chief Executive Officer, and director of Panda, a technology company, whose stock is publicly traded on the NASDAQ National Market System" and the other was "Panda's Vice President of Strategic Business since 1997 and is now its Acting Chief Financial Officer").

Sassani's declaration also states that he "had not . . . had previous experience with promissory notes and related security documents . . . ." (ECF No. 70, Sassani Decl. ¶ 9.) The Court does not credit this statement, because it is flatly contradicted by KLP's evidence that he had participated in and signed a similarly complex loan agreement only a year before, which also included a waiver of jury trial rights. (*See* ECF No. 76-4, Silver Reply Decl. Ex. 4 (February 20,

2015 Loan and Security Agreement between Bridge Bank, National Association and Ekoventure, Inc., signed by Sassani).)

Sassani further argues that he was "[u]nrepresented by counsel" during the negotiation. (ECF No. 69 at 11.) Even if it is true that Sassani never believed Cook or Gunderson represented him personally, never signed an engagement letter with them, and was never billed for legal services, it is clear from the evidence before the Court that Cook and Gunderson effectively used their professional expertise to assist him in the negotiations. (ECF No. 70, Sassani Decl. ¶ 9.) Sassani solicited advice from Cook and Gunderson attorneys on the loan structure throughout the negotiation. (*See* ECF No. 76-6, Silver Reply Decl. Ex. 5 (Sassani asks "Gunderson, can you please confirm [Brencher's proposal that Sassani and KLP sign a side letter to purchase Zozi stock] makes sense?"); ECF No. 76-7, Silver Reply Decl. Ex. 6 at 2-3 (Sassani asks Cook to "review . . . [and] approve" the final drafts of the agreements and provide guidance on the method to distribute the loan to avoid triggering an IRS audit). And, as Sassani admits, they provided edits and comments on the relevant agreements, which Sassani sent to Brencher at KLP. (*See* ECF No. 76-2, Silver Reply Decl. Ex. 1 (Sassani sends "comments from counsel" to KLP and attaches extensively marked up version of the Note, Pledge Agreement, and Security Agreement with header "GDS Comments 4/5/16"); ECF No. 70, Sassani Decl. ¶ 4 ("The 'counsel' referred to in the email [ECF No. 76-2] is Joshua Cook . . . Cook reviewed a draft of the Note and suggested a few changes, which I communicated to Boms.").) Sassani even held out Gunderson at one point as "my counsel" during the course of the negotiations with KLP. (ECF No. 76-5, Silver Reply. Decl. Ex. 4, at 2.) The evidence shows that Sassani was assisted by Cook and the other Gunderson attorneys.

Based on all of these factors, KLP has shown that Sassani had sufficient business acumen. *See Lehman Bros. Holdings Inc.*, *LLC*, 801 F. Supp. 2d at 232 (individual had sufficient business acumen where he "built and ran a national enterprise," "negotiated loans for his corporation and reviewed loan documentation, was involved in the purchase and sale of real estate, and participated in negotiations for the $175 million sale of his business in 2006. . . and demonstrated business acumen by requesting specific data and asking specific, detailed questions about the sophisticated transactions [] proposed.").

Fourth and finally, the jury waivers were conspicuous. "Factors to consider when making this determination include: the placement of the waiver, i.e. whether the provision was 'buried in a multitude of words,' . . . the size and style of the print, . . . and the location of the provision within the entire document." *Wechsler*, 2003 WL 21878815, at *5. Here, all three jury trial waiver provisions were in separate paragraphs, in all capital letters, and with captions indicating they were waivers. (*See* Note at § 18.1; *id.*, Pledge Agreement at § 16; Sec. Agreement at § 21.) The prominence of the waivers weighs in favor of their enforcement. *See Morgan Guaranty Trust Co.*, 36 F. Supp. 2d at 604 (upholding a jury waiver that was written in all capital letters); *Wechsler*, 2003 WL 21878815, at *5 ("The jury waiver provisions in this case are sufficiently conspicuous to warrant enforcement because they are set off in separate paragraphs containing other provisions related to litigation procedures, and are clearly stated in the first sentence of these paragraphs."). Sassani does not raise any argument to the contrary. (ECF No. 69 at 9–12.)

In sum, KLP has shown all four factors favor enforcement of the jury trial waivers. Accordingly, I conclude that the jury trial waivers in the Note, Pledge Agreement, and Security Agreement are valid and enforceable because Sassani entered into them knowingly, intentionally and voluntarily.

**B.     All But One of the Claims Fall Within The Scope of the Jury Waivers**

I must next determine whether the claims in this action fall within the scope of the jury trial waivers.  *See Kortright Capital Partners LP*, 327 F. Supp. 3d at 686 ("If a contractual jury waiver is enforceable, a court must then analyze whether the claims in the action fall within the scope of the jury waiver clause."); *Wechsler*, 2003 WL 21878815, at *6 (determining whether, "even if the jury trial waivers are valid, they are . . . applicable to the claims raised in this case.").  "In interpreting these provisions, courts have reiterated the general precept that contractual provisions containing jury trial waivers should be 'narrowly construed.'"  *Kortright Capital Partners LP*, 327 F. Supp. 3d at 686 (citing, *inter alia*, *Wechsler*, 2003 WL 21878815, at *6).  Nonetheless, "[t]he language of enforceable waiver provisions must be construed literally."  *Id*.

Here, all three provisions are worded identically in relevant part.  Sassani agreed to waive his jury trial right "in respect of any litigation based on, or arising out of, under or in connection with [the Note, the Note and Pledge Agreement, and or the Note and Security Agreement, respectively], or any agreement contemplated to be executed in connection with this agreement or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party with respect hereto."  (*See* Note § 18.1; Pledge Agreement § 16; Sec. Agreement § 21.) Following the Court's summary judgment ruling, the remaining claims are KLP's claim for breach of the Note and Sassani's counterclaims for breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, breach of the Amended Voting Agreement, and violation of the Uniform Commercial Code.  (*See* ECF No. 54.)  I analyze each in turn.

### 1. *KLP's Claim for Breach of the Note*

KLP's sole cause of action for breach of the Note falls within the scope of the jury waiver provisions, because Sassani explicitly agreed in the Note to waive his jury trial right in litigation "based on, or arising out of, under or in connection with th[e] Note." (Note § 18.1; *see also* ECF No. 1 (alleging numerous "Events of Default" under the Note).) Sassani concedes this point. (ECF No. 69 at 12 n.1.)

### 2. *Sassani's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Two)*

Sassani argues that his counterclaims fall outside the scope of the waiver provisions. Sassani's first remaining counterclaim is that "KLP breached the covenant of good faith and fair dealing implied into the [] Note, in bad faith, by causing Sassani to be terminated from Zozi" and triggering a default. (ECF No. 32 at ¶ 95; *id.* ¶¶ 92–102.) Sassani further alleges that after KLP called the loan in bad faith, instead of giving Sassani the opportunity to repay the amount owed, KLP seized the collateral (which exceeded the value of the loan) to give itself control over Zozi. (*Id.* at ¶¶ 95, 97–98.)

Because Sassani explicitly alleges that KLP breached the duty of good faith and fair dealing implicit in the Note, this counterclaim is subject to the Note's jury waiver provision, which covers litigation "based on, or arising out of, under or in connection with th[e] Note." (Note § 18.1.) Sassani's only argument to the contrary is that this counterclaim "allege[s] breach of duties that arise independently of the Note." (ECF No. 69 at 14.) This argument is unpersuasive because it ignores the nature of a claim for breach of the covenant of good faith and fair dealing as well as the literal language of the waiver provision, which reaches litigation not just "based on" or "arising out of" the Note, but also litigation "under or in connection with" the Note. Under Connecticut law, a claim for breach of the covenant of good faith and fair dealing requires an underlying

contract, because the covenant that is the subject of the claim is contained in the contract. *See Brule v. Nerac, Inc.*, 127 Conn. App. 315, 322 n.4 (2011) ("Because we conclude that . . . a contract did not exist, [plaintiff's] breach of the implied covenant of good faith and fair dealing claim also was properly stricken."); *Martin v. PARCC Health Care*, No. CV054010900S, 2008 WL 5148767, at *3 (Conn. Super. Ct. Nov. 7, 2008) ("[A] breach of the implied covenant of good faith and fair claim dealing requires an underlying contract."); Connecticut Judicial Branch Civil Jury Instructions, § 4.2-11 Implied Covenant of Good Faith and Fair Dealing ("Every contract contains an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other party to receive the benefits of the contract. The concept is essentially a rule of construction . . . . It is not a separate contractual claim . . . ."). Thus, a claim for breach of the covenant of good faith and fair dealing is necessarily "based on" and certainly "aris[es] out of" the underlying contract, here, the Note. Such a claim is in any event plainly within the broad phrase "litigation . . . in connection with" the Note. *See Coregis Ins. Co. v. Am. Health Found.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (construing an insurance contract and noting that "relating to" and "in connection with" are equivalent and have a broader meaning than "arise out of"). "[P]hrases such as 'in connection with' or 'related to' are considered broad enough to encompass all claims that are directly related to the contract, such as an action for breach of contract, and collateral issues that can fairly be said to relate to the parties' main agreement." *Sherrod*, 2014 WL 6603879, at *5 (collecting cases). Courts have interpreted such collateral issues to include tort claims connected "in some way" to the underlying agreement. *See, e.g.*, *Kortright*, 327 F. Supp. 3d at 687 (construing waiver of claims "relating in any way" to the relevant agreement as encompassing negligent misrepresentation claim). An implied covenant claim based on alleged obligations under the Note itself is even more plainly connected "in some way" to the Note.

### 3. *Sassani's Counterclaim for Tortious Interference with Contractual Relations (Count Three)*

Sassani's next counterclaim, for tortious inference with contractual relations, stands on different footing. This counterclaim alleges that KLP interfered with his employment contract with Zozi by causing Zozi to fire Sassani without justification. (ECF No. 32 at ¶¶ 103–11.) Sassani alleges that such interference was tortious because: it "included misrepresentations of Sassani's performance under the contract"; KLP violated its fiduciary duty of care and loyalty to Zozi and its minority shareholders as its interference was detrimental to Zozi's interests; KLP ordered Boms and Barth (a Zozi board member KLP allegedly controlled) to violate their fiduciary duties to Zozi and its shareholders; and KLP ordered one or more of its agents to deny Sassani medical leave to which he was entitled under federal and California law. (*Id.* ¶¶ 107–110.)

KLP argues that the jury waiver provision encompasses this counterclaim based on the "improper motive" theory Sassani argued in opposition to summary judgment, namely, that KLP's motivation in firing him was to trigger a default under the Note. (*See* ECF No. 66-1 at 14; ECF No. 54 at 10.) Sassani argues that because the evidence at trial *might* show a motivation not related to the Note, the claim as a whole should proceed to the jury. (*See* ECF No. 69 at 13.) KLP counters that Sassani is judicially estopped from proceeding to trial under a different theory. (ECF No. 76 at 11.) I disagree; Sassani's pointing to evidence of one "improper motive" in opposition to summary judgment is not inconsistent with trying the claim under multiple, alternative theories of motive. The more pertinent question – which the parties do not address – is whether the allegations in the pleadings or the evidence adduced in discovery determines whether a particular counterclaim is covered by an enforceable jury waiver. I conclude that I should look to the allegations in Sassani's counterclaims to determine the scope of the jury waiver.

First, the language of the jury waiver provision suggests that the pleadings should be the point of reference. The waiver is "in respect of any litigation based on, or arising out of, under or in connection with" various specified instruments and conduct. Pleadings define the scope of any litigation, and courts thus ordinarily examine the pleadings, not the evidence, to determine the source from which a litigation "arises." *Marsteller v. Butterfield 8 Stamford LLC*, No. 3:14CV01371(AWT), 2017 WL 5769903, at *3 (D. Conn. Nov. 27, 2017) ("[I]t is the complaint that defines the claims"); *Infanti v. Scharpf*, No. 06 CV 6552 (ILG), 2008 WL 2397607, at *1 (E.D.N.Y. June 10, 2008) ("Compliance with Rule 8 [setting forth pleading standard for complaint] also allows courts to determine whether the doctrine of res judicata is applicable to the allegations in the complaint."); *Winne v. Equitable Life Assurance Soc'y of U.S.*, 315 F. Supp. 2d 404, 409 (S.D.N.Y. 2003) ("In determining whether a claim arises under federal law, the court examine[s] the well pleaded allegations of the complaint . . . .").

Second, whether the parties have a right to a jury trial is a determination that must be made before the trial starts and any evidence is presented, and thus in contracting for a waiver of this right, the parties likely intended that the Court determine the issue of waiver from the pleadings rather than from the particular evidence collected to support or oppose a claim. *See LaPosta v. Lyle*, No. 5:11CV177, 2012 WL 1752550, at *11 (N.D.W. Va. May 16, 2012) (determining "based upon the pleadings" whether plaintiffs' claims were covered by a jury waiver); *Kortright*, 327 F. Supp. 3d at 687 (same).

Sassani's tortious interference counterclaim makes no reference to the Note, Pledge Agreement, or Security Agreement. (ECF No. 32 at ¶¶ 103–11.) Nor does it appear that any of those documents is implicit in or necessary to any of the tortious interference allegations. And at least one theory of this counterclaim does not even appear remotely connected to the Note and

Security Agreements: Specifically, Sassani alleges that he was fired so Zozi did not have to give Sassani required medical leave. (*Id.* ¶ 110.) Although the relevant waiver provisions are broad, this claim is neither "based on, or arising out of, under or in connection with [the Note, the Note and Pledge Agreement, and or the Note and Security Agreement, respectively]" or "any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party with respect [the Note, the Note and Pledge Agreement, and or the Note and Security Agreement]." (Note § 18.1; Pledge Agreement § 16; Sec. Agreement § 21.) In fact, Sassani's alleged violation of federal and California medical leave requirements has no apparent logical connection to the Note and related documents or to any "course of conduct" or "actions" "with respect" to those documents. Even if the trial evidence ends up showing that KLP terminated Sassani to trigger a default, that would not alter the fact that at least one of his theories of tortious interference is "based on" and "aris[es] out of" the termination of his employment in violation of medical leave law. Because KLP has the burden to show that the waiver applies, and because jury waivers are to be construed narrowly, I conclude that KLP has not shown that Sassani waived his jury right with respect to his counterclaim for tortious interference with contractual relations.

4.   *Sassani's Counterclaim for Breach of the Amended Voting Agreement (Count Five)*

Sassani's counterclaim for breach of the amended voting agreement does fall within the jury waiver provisions, however. For this counterclaim, Sassani alleges that KLP's sale of Zozi to Peek without Sassani's vote violated a different agreement between KLP and Sassani, the Amended Voting Agreement dated January 4, 2017. (ECF No. 32 at ¶¶ 116–123; *see also id.* ¶¶ 78–80.) Specifically, Sassani alleges that "Boms and KLP orchestrated a plan to capture all of Sassani's common stock, thereby mooting his drag-along rights" required under the agreement to effectuate a sale of Zozi. (*Id.* at ¶¶ 41, 42.) According to Sassani, "at the proverbial last minute,

Boms forced Sassani to also include all of his common stock as collateral" for the loan. (*Id.* at ¶ 40.) Following the manufactured default, Sassani alleges that "KLP claimed to take possession over all the collateral Sassani offered for the loan" under the Pledge and Security Agreements, including his Zozi common stock, and then notified him that KLP would be "selling off" those shares. (ECF No. 32 at ¶¶ 74, 75.) The counterclaim does not allege that such shares were in fact sold, but instead alleges that a California Superior Court enjoined KLP from selling them. (*Id.* at ¶ 78.) Sassani further alleges that Zozi was sold to Peek without a vote. (*Id.* at ¶¶ 118, 121.) Sassani contends that, under the Amended Voting Agreement, no such sale could take place without the approval of the majority holders of Zozi's common stock, which required Sassani's approval because of his dragalong rights. (*Id.* ¶¶ 19, 80, 118, 121.) Therefore, Sassani alleges, the sale of Zozi without obtaining his consent constituted a breach of the Amended Voting Agreement. (*Id.* at ¶ 121.)

The jury waiver provisions not only reach "litigation based on, or arising out of, under or in connection with [the Note, the Note and Pledge Agreement, and or the Note and Security Agreement]," but also "*any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party with respect hereto.*" (*See* Note § 18.1; Pledge Agreement § 16; Sec. Agreement § 21 (emphasis added).) This broad language extends to Sassani's counterclaim for breach of the voting agreement, which is "litigation based on, or arising out of, under or in connection with" KLP's purported "course of conduct, course of dealing, statements . . ., or actions" taken "with respect" to the Note, Security Agreement, and Pledge Agreement. (*Id.*) The common thread is Sassani's allegation that the Pritzkers (who controlled KLP) seized Sassani's pledged Zozi common stock – an action with respect to the Pledge Agreement – according to their "master plan" to obtain control and sell Zozi without Sassani's participation. (ECF No. 32 at ¶¶

4, 42, 73, 74.)  When that plan was stalled by the California state court's TRO, Sassani alleges, they sold the company anyway without Sassani's consent.  (*Id.* at ¶¶ 78–80.)  In short, the core alleged facts underlying Sassani's counterclaim necessarily implicate KLP's "course of conduct" and "actions" with respect to the Note, Pledge Agreement, and Security Agreement, and so it is subject to the jury waiver.

Sassani argues the jury waiver provisions do not cover this counterclaim, because the Amended Voting Agreement was "executed a year after the note," and it is a "separate agreement the breach of which is not covered by the Note's jury waiver."  (ECF No. 69 at 14.)  But his argument largely ignores the more sweeping language that waives his jury trial right in any "litigation based on, or arising out of, under or in connection with . . . any course of conduct, course of dealing, statements  . . ., or actions" taken "with respect" to the Note, Security Agreement, and Pledge Agreement, which does encapsulate this counterclaim.  (*See* Note § 18.1; Pledge Agreement § 16; Sec. Agreement § 21.)

The cases Sassani points to say little about *these* jury waivers.  (ECF No. 69 at 15.)  The jury waiver in *In re Actrade Fin. Techs. Ltd.* was broader than the one here since it encompassed any dispute "arising from" the "relationship" between the parties and was thus found to include tort claims related to the contract claims between the parties; *Arctrade* thus gives the Court little help on the effect of the more specific language involved in this case.  No. 02-16212(ALG), 2007 WL 1791687, at *1–2 (Bankr. S.D.N.Y. June 20, 2007).  *Wechsler* provides even less guidance, since not only was the waiver provision there narrower than the one here (in particular, limited to "any action or proceeding arising from any action brought under th[e] agreement"), but the parties agreed that it could not waive defendants' jury trial rights on fraudulent conveyance claims where at least some of those defendants were *not parties* to the agreement containing the jury waiver.

*See Wechsler*, 2003 WL 21878815, at *2, *6–7 (bifurcating contract claims against defendants subject to the above waiver from fraudulent conveyance claims against other defendants "to which both parties agree, defendants are entitled to a jury trial."). Those circumstances are simply not present here, since there is no dispute that Sassani – the party seeking a jury trial – actually signed the Note, Security Agreement, or Pledge Agreement containing the waiver.

Sassani further responds that, as with his counterclaim for tortious inference, the theory of his counterclaim for breach of the Amended Voting Agreement described above is simply one "potential argument that Sassani may make at trial" and the "applicability of the jury waiver should not and does not depend on which one defendant chooses to pursue." (ECF No. 69 at 14.) But unlike the counterclaim for tortious interference, Sassani has pleaded only one theory of this counterclaim – that it was the actuation of KLP's "master plan" to seize control of Sassani's pledged common stock under the Pledge Agreement and sell Zozi without Sassani's approval. Further, seizing control of Sassani's pledged common stock – a critical element of this claim – is, literally, an "action[]" of a party "with respect [to the Pledge Agreement]," which entitles KLP to take control of the shares in the event of a default by Sassani. Accordingly, based on his pleading, Sassani's counterclaim falls within the jury waiver.

5.  *Sassani's Counterclaim for Violation of the Uniform Commercial Code ("UCC") (Count Six)*

Finally, Sassani argues that his counterclaim alleging that KLP violated the UCC also does not fall within the jury waiver provisions. For this counterclaim, Sassani alleges that "[he] pledged his shares in Lux as collateral for the Full Loan," but "KLP refuses to release Sassani's shares in Lux . . . even though the other collateral held by KLP is more than sufficient to satisfy Sassani's debt to KLP." (ECF No. 32 at ¶¶ 82, 85.) Sassani alleges that KLP's "failure and/or refusal to release Sassani's Lux shares to him" violated several of its duties under the UCC, including to "act

25

to proceed in a commercially reasonable manner with respect to any collection efforts . . . pay the debtor (here, Sassani) for any surplus . . . and act in a commercially reasonable manner with respect to the disposition of collateral." (*Id.* at ¶¶ 124–127.)

As pleaded, this counterclaim constitutes "litigation . . . in connection with [the Note, Pledge Agreement, and Security Agreement]." (Note § 18.1; Pledge Agreement § 16; Sec. Agreement § 21.) KLP's alleged refusal to release the Lux shares – which Sassani pledged as collateral for the $5.7 million loan under the Note, Security Agreement, and Pledge Agreement – is clearly connected "in some way" to those agreements. Thus, the UCC counterclaim is subject to the jury waiver provisions as well.

## IV.     Conclusion

KLP's motion to strike Sassani's jury demand is GRANTED in part and DENIED in part, as follows.  (ECF No. 66.)   KLP has shown that the jury trial waivers in the Note, Pledge Agreement, and Security Agreement are enforceable because Sassani entered into them knowingly, intentionally, and voluntarily.   KLP has also shown that the jury trial waivers encompass its claim for breach of the note and Sassani's counterclaims for breach of the implied covenant of good faith and fair dealing (Count Two), breach of the Amended Voting Agreement (Count Five), and violation of the UCC (Count Six).   Accordingly, KLP's motion to strike is granted with respect to those claims and counterclaims.   However, KLP has failed to carry its burden with respect to Sassani's counterclaim for tortious interference with contractual relations (Count Three).   Accordingly, KLP's motion to strike is denied with respect to that counterclaim.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                June 20, 2019